IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 3, 2015

IN RE F.N.M.

Appeal from the Chancery Court for Williamson County
No. 1611A    James G. Martin III, Chancellor

No. M2015-00519-COA-R3-PT – Filed April 11, 2016

This is a termination of parental rights case. F.N.M. (the child) was born out of wedlock while her biological father, W.C.G. (father), was incarcerated. Shortly after the child's birth, A.M.M. (mother) gave the child's physical custody to individuals, who would later choose to be the prospective adoptive parents. Soon thereafter, mother surrendered her parental rights to the child. The prospective adoptive parents filed a petition for adoption and termination of father's parental rights. Father opposed the adoption and filed a petition to establish paternity. After a hearing, the trial court found father to be the child's biological parent; but it also found that there is clear and convincing evidence supporting termination of his parental rights. Furthermore, the court found, by clear and convincing evidence, that termination is in the child's best interest. Father appeals. We modify the trial court's judgment. As modified, the judgment terminating father's rights is affirmed.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J., joined. W. NEAL MCBRAYER filed a separate dissenting opinion.

Marianna Williams and Richard J. Schoepke, Dyersburg, Tennessee, for the appellant, W.C.G.

Imogene W. Bolin, Smyrna, Tennessee, and Mark J. Downton, Nashville, Tennessee, for the appellees, S.L.D. and B.W.D.

Robert H. Plummer, III, Franklin, Tennessee, guardian ad litem for F.N.M.

**OPINION**

I.

Following communications on the internet, mother and father met for the first time in August or September 2011.[1] The trial court found the two began an intimate relationship shortly thereafter, and father soon moved into mother's apartment. At the time, father was on probation from a twenty-year prison sentence. On October 2, 2011, father's employer accused him of theft. He was fired immediately and became subject to an arrest warrant. In late October or early November 2011, mother first learned she was pregnant; she soon told father that she was pregnant with his child. In November 2011, at father's request, a physician confirmed the pregnancy. In December 2011 or January 2012, mother discovered the outstanding warrant for father's arrest and turned him in to the police. He was arrested at her apartment on January 25, 2012. He later entered a best-interest guilty plea and remained incarcerated until October 3, 2014.

Mother decided to put her unborn child up for adoption. Father learned of this in February 2012. A few weeks before the child's birth, father filed with the Putative Father Registry on June 27, 2012. While mother was at the hospital preparing for the child's birth, she discussed with a hospital nurse her decision to put the child up for adoption. The nurse put her in touch with the prospective adoptive parents, S.L.D. and B.W.D. (petitioners). On July 16, 2012, two days after the child's birth, mother gave the child's physical custody to the petitioners. Petitioners' attorney informed father on July 27, 2012 that petitioners intended to file a petition to adopt on July 30, which they did. In the same petition, they asked the court to terminate father's parental rights. Also on July 30, the court granted the petitioners' motion for partial legal guardianship. On August 2, 2012, father filed an "Emergency Petition to Establish Paternity and Other Relief." Father's mother (R.F.) and stepfather (J.F.) soon filed a motion to intervene as third parties,

---

[1] In assessing the credibility of mother and father as to dates and other matters, the trial court stated that

> neither [mother] nor [father] is completely credible. The [c]ourt has, in its findings of fact, accepted some of the testimony of each of those persons and disregarded other parts of their testimony. Each of those persons had a motive to be less than candid with the [c]ourt, and the [c]ourt finds on occasion each of them was less than candid. [Mother] was vitally interested in protecting the custodial relationship that she has with her other daughter, Natalie, and denied certain facts which might have impaired the continuation of that relationship. [Father] was interested in gaining custody of [the child] and shaded his testimony when he thought it would be in his best interest. Accordingly, inherent in the [c]ourt's findings of fact is the [c]ourt's determination of the portion of the testimony offered by [mother] and the portion of the testimony offered by [father], which the [c]ourt finds credible.

seeking temporary custody of the child, pending the results of a DNA test, which was administered in an effort to determine whether father was the child's biological parent. Their motion was later dismissed on the ground of lack of standing.

The trial court found father to be the child's biological parent. The court also found clear and convincing evidence to terminate his parental rights on four separate grounds – abandonment by acts of wanton disregard; failure to promptly pay, without cause or excuse, a reasonable share of parental, natal, and postnatal expenses involving the birth of the child; failure to manifest an ability and willingness to assume legal and physical custody of the child; and risk of substantial harm to the physical and psychological welfare of the child if the child was placed in father's legal and physical custody.[2] By clear and convincing evidence, the court also determined that termination of father's parental rights was in the child's best interest. Father appeals.

## II.

Father raises several issues on appeal, which we summarize below.

> 1. Whether clear and convincing evidence supports the trial court's decision to terminate father's parental rights on the grounds of
>
>> A. Abandonment by acts of wanton disregard;
>>
>> B. Failure to promptly pay, without good cause or excuse, a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child;
>>
>> C. Failure to manifest an ability and willingness to assume legal and physical custody of the child;
>>
>> D. Placing custody of the child in the father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

---

[2] Petitioners alleged an additional ground on which to terminate father's parental rights. They alleged that his failure to establish paternity in the time allowed by law barred his right to contest the petition for termination and adoption. The trial court found that the petitioners failed to prove this ground by clear and convincing evidence. This issue is not before us on this appeal.

2. Whether clear and convincing evidence supports the trial court's determination that termination of father's parental rights is in the best interest of the child.

III.

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)) (internal citations omitted). However, this right is not absolute. *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing *State Dep't of Children's Servs. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)).

Parties seeking to terminate a biological parent's parental rights must prove, by clear and convincing evidence, at least one statutory ground. *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *3 (Tenn. Ct. App. E.S., filed Oct. 30, 2007) (citing Tenn. Code Ann. § 36-1-113(c)(1)). A petitioner also must prove by clear and convincing evidence that termination is in the child's best interest. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (internal quotation marks and citation omitted).

We review this non-jury case de novo upon the record, mindful that the trial court's factual findings are presumed to be correct unless the evidence preponderates against those findings. There is no presumption of correctness as to the trial court's conclusions of law. *C.H.K.*, 154 S.W.3d at 589 (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996); Tenn. R. App. P. 13(d)). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, 2007 WL 3171034, at *4 (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

IV.

We first consider whether the petitioners proved by clear and convincing evidence the ground of wanton disregard of the child by father. Termination on this ground is proper if "the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. §§ 36-1-102(1)(A)(iv) and -113(g) (Supp. 2015). This ground "applies to a parent who was incarcerated during all or part of the four months immediately preceding the filing of the petition to terminate that parent's rights. . . ." *In re T.M.H.*, No. M2008-02427-COA-

4

R3-PT, 2009 WL 1871873, at *6 (Tenn. Ct. App. M.S., filed June 29, 2009) (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Here, father was incarcerated for the entire four months preceding the petitioners' filing.

A parent's incarceration alone is not grounds for termination, but it is a "triggering mechanism," which "allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Tenn. Code Ann. § 36-1-102(1)(A)(iv) does not explicitly define "wanton disregard." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. M.S., filed Apr. 25, 2005). "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. M.S., filed June 9, 2015).

When determining whether termination is proper under this ground, courts are not limited to considering the parent's conduct in the four months prior to incarceration. *In re T.M.H.*, 2009 WL 1871873, at *7 (citing *In re Audrey S.*, 182 S.W.3d at 865). Additionally, in the context of this ground for termination, "our courts have extended the definition of 'child' to include the period of pregnancy." *In re Anthony R.*, 2015 WL 3611244, at *3 (internal citations omitted). Therefore, "[t]he conduct may occur before the birth of the child whose welfare is thereby put at risk." *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *9 (Tenn. Ct. App. W.S., filed May 28, 2014), *appeal denied* (Aug. 22, 2014) (quoting *In re T.M.H.*, 2009 WL 1871873, at *7) (internal quotation marks omitted).

In this case, father admitted at trial that he has been "very irresponsible" in his adult life. In December 2000, shortly after dropping out of high school, father pled guilty to thirteen felony thefts, three misdemeanor thefts, and one felony burglary. He was sentenced to nine months of incarceration and ten years of probation. He violated his probation in 2008, resulting in a six-month jail sentence and a ten-year extension of his probation. On October 2, 2011, $18,000 was discovered missing from father's workplace, Raceway Convenience Store. Father's employer discovered a surveillance video that linked father to the incident. As a result, he was fired from his job, again charged with theft, and a warrant was issued for his arrest, which he had learned of by mid-October 2011, a few weeks before he learned of the pregnancy.

Despite father's testimony to the contrary, the trial court determined father did not share details about his criminal past with mother, nor did he tell her about the theft charge he incurred while living with her. The trial court found that father also kept from mother that he had a young son, Bryce, from a previous relationship and that, as of September 9,

2011, he owed $9,631.82 in unpaid child support for that son. After being fired from Raceway, father continued living with mother but contributed nothing toward her household expenses. Mother testified at trial that after the pregnancy was confirmed father offered to pay for an abortion – an offer she refused. Mother stated that after that, father would not discuss the pregnancy or the child with her. Father disputed this. The trial court resolved this dispute in mother's favor.

The trial court found father's actions constituted abandonment by "wanton disregard:"

> What conduct did [father] engage in with respect to [the child] that would constitute wanton disregard? [Father] had unprotected sex with [mother] that resulted in her pregnancy. [Father] did so knowing that if [mother] became pregnant, he had no money or property that he could use to assist [mother] during the course of her pregnancy, had no employment, and he had serious criminal charges pending against him . . . . [Father] was in no position to support a child that might result from his having unprotected sexual relations with [mother]. Further, after [mother]'s pregnancy was confirmed in November 2011, [father] obtained no employment even though he claims he made efforts to do so, which the Court simply discounts, and he declined to discuss the pregnancy with [mother] beyond his offer to pay for an abortion. [Father]'s attitude toward his son, Bryce, from the time [mother] became pregnant until [father] was taken into custody on January 25, 2012, is certainly reflective of his attitude toward any child or children that he might father. [Father] had no contact with Bryce. He provided no support for Bryce. He provided no gifts during the Thanksgiving and Christmas holidays. He never visited Bryce on any occasion. . . . Further, [father] was fully aware by February, 2012, that [mother] intended to place her unborn child for adoption. While he was in prison, [father] worked and earned a modest income. He did not use any of his earnings to help support [mother] during the time of her pregnancy. [Father] became actively involved in the efforts of [mother's] former husband to obtain custody of their daughter, Natalie.[3] The only positive thing that [father] did which would reflect on his wanton disregard, or lack thereof, was filing notice with the

---

[3] The trial court found that in the spring of 2012, father "voluntarily gave a deposition in support of Natalie's father and his quest to gain custody of Natalie."

Putative Father Registry in Davidson County on June 27, 2012 . . . .

The Court finds by clear and convincing evidence that [father]'s having unprotected sexual relations with [mother] under the circumstances of his criminal and social history and his conduct after learning of [mother]'s pregnancy with [the child] demonstrates wanton disregard for the welfare of [the child].

(Footnote added.)

We disagree with the trial court's reasoning on this ground. First, we have not found any case law holding that a person acts with wanton disregard for the welfare of his or her child by conceiving the child, regardless of the "criminal and social history" of the individuals involved. Contrary to the reasoning applied by the trial court,

[l]ogically, a person cannot disregard or display indifference about someone whom he does not know exists. . . . [W]hile the statutory reference to 'the child' can mean a child *in utero*, the wanton disregard language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) must be construed to *require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken*.

*In re Anthony R.*, 2015 WL 3611244, at *3 (emphasis added). Furthermore, we note that father committed each theft or burglary offense before he knew of the pregnancy. In explaining its finding on this ground, the trial court also included father's decisions to file notice with the Putative Father Registry, father becoming involved in the custody dispute between mother and her ex-husband, and father's failure to send mother any of the money he earned in prison. All of these actions occurred *after* father's incarceration. "Wanton disregard" considers a parent's "conduct *prior to* incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added).

We note that in the time period after father learned of the pregnancy but before his incarceration, he relied on support from mother and provided no support to her in return. Father was unemployed, and the trial court doubted his testimony that he had sought new employment. In the same time frame, mother worked regularly, but struggled to support the household by herself. Eventually, she was evicted from her apartment for not paying rent. During this same period, father also evaded an arrest warrant and failed to make any child support payments to Bryce, in defiance of a September 2011 court order to make monthly support payments of $300, the first of which was due October 1, 2011.

7

"We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68 (citations omitted). For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated, *In re Jamazin H.M.*, 2014 WL 2442548, at \*9; *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at \*1 (Tenn. Ct. App. Apr. 1, 2013), or commits a crime that puts the unborn child at risk of physical harm, *In re T.M.H.*, 2009 WL 1871873, at \*7 (finding father's commission of a violent physical attack on the mother of an unborn child during her pregnancy exhibited a wanton disregard); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) (finding mother ingested illegal drugs during her pregnancy, demonstrating a wanton disregard).

Regarding the ground of wanton disregard, we find it significant that the incident that resulted in father's incarceration occurred before he knew of the pregnancy. Father's actions in the time between learning of the pregnancy and his arrest are simply insufficient to establish by clear and convincing evidence that he acted with wanton disregard for the child's welfare. We note, though, that his actions in that time period are relevant to other grounds for termination that we will now consider.

V.

A.

The trial court found three additional grounds to terminate father's parental rights. These grounds directly implicate two separate code provisions, *i.e.*, Tenn. Code Ann. § 36-1-113(g)(9)(A) and § 36-1-117(b), (c). To aid the reader in understanding the interplay between these separate code provisions, we will quote relevant language from both:

Tenn. Code Ann. § 36-1-113(g)(9)(A)(i)-(v)

> The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . is not the legal parent . . . of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
>
> > (i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth

8

of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

\* \* \*

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child; [or]

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

\* \* \*

Tenn. Code Ann. § 36-1-117(b)-(c)

(b)(1) If a petition has been filed to establish paternity of the child who is the subject of the adoption proceeding, the adoption court shall have exclusive jurisdiction to hear and decide any paternity petition filed in the adoption proceeding or that has been transferred to it pursuant to § 36-2-307.

\* \* \*

(c) The parental rights of the putative[4] biological father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to §

---

[4] The word "putative" is not defined anywhere in this statutory scheme. Therefore, we interpret it according to its "plain and ordinary" meaning. *See **Snyder v. First Tennessee Bank, N.A.**,* No. E2015-00530-COA-R3-CV, 2016 WL 423806, at \*9 (Tenn. Ct. App. E.S., filed Feb. 3, 2016) (citing ***Shockley v. Mental Health Coop., Inc.**,* 429 S.W.3d 582, 591 (Tenn. 2013)). According to Webster's II New Riverside University Dictionary, "putative" is defined as "[r]egarded as such: supposed" and "[a]ssumed to exist or to have once existed." Webster's II New Riverside University Dictionary pg. 958 (Anne H. Soukhanov ed., 1994) (italics in original removed).

9

36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

> (1) The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318 a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

(Footnote added.)

We begin our analysis of the interplay between these two code sections by focusing on the language of Tenn. Code Ann. § 36-1-113(g)(9)(A). As can be seen, this section expressly provides that the "termination" language in § 36-1-113(g)(9)(A) is *not* applicable to a "legal parent . . . of" a child. Rather, it is *only* applicable to a father who is described in § 36-1-117(b) or (c). Thus, our initial task is to determine whether the father in the case now before us is a "legal parent."

The concept of a "legal parent" is specifically addressed in Tenn. Code Ann. § 36-1-102(28). That section provides as follows:

> (A) "Legal parent" means:
>
> (i) The biological mother of a child;
>
> (ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
>
> (iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

10

(iv) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v) An adoptive parent of a child or adult[.]

(B) A man shall not be a legal parent of a child based solely on blood, genetic, or DNA testing determining that he is the biological parent of the child without either a court order or voluntary acknowledgement of paternity pursuant to § 24-7-113. Such test may provide a basis for an order establishing paternity by a court of competent jurisdiction, pursuant to the requirements of § 24-7-112[.]

In the current case, mother and father were never married and one never attempted to marry the other. The trial court found that, "[a]t no time prior to the entry of [the final order], has any court entered an order finding [father] to be the legal parent of [the child]." Nothing in the record contradicts this finding. There is also no indication in the record that father signed a voluntary acknowledgement of paternity, though we note that, a few weeks before the child's birth, he did file an intent to claim paternity with the Putative Father Registry. However, it is clear from the statutory scheme under review that "an intent to claim paternity filed with the Putative Father Registry" is not the same as "a voluntary acknowledgement of paternity." These are words of art. They are separate concepts with different meanings. *See, e.g.*, Tenn. Code Ann. §§ 36-2-318(e). Reading the language of § 36-1-102(28), we conclude that father does not fall within any of the various meanings of the statutory words "legal parent."[5]

---

[5] We are not unmindful of our Court's opinion in ***In re Ashton B.***, No. W2015-01864-COA-R3-PT, 2016 WL 981320 (Tenn. Ct. App. W.S., filed Mar. 15, 2016). We agree with that opinion's discussion of the meaning of 36-1-117(b) and (c). We believe the plain language of those sections means that father in the case now before us is subject to the "termination" language of 36-1-113(g)(9)(A). *See also* ***In re Alexis M.M.***, No. E2012-00022-COA-R3-PT, 2012 WL 3553628, at *5-*7 (Tenn. Ct. App. E.S., filed Aug. 20, 2012); ***In re Dixie M.M.,*** No. M2012-01226-COA-R3-PT, 2012 WL 4474155, *1, *7 (Tenn. Ct. App. M.S., filed Sept. 27, 2012); ***In re Isaiah L.A.***, No. E2012-00761-COA-R3-PT, 2012 WL 6671768, at *10 (Tenn. Ct.

11

B.

Having determined that father is not the "legal parent," we now move to the additional language found in Tenn. Code Ann. § 36-1-113(g)(9)(A), which mandates that a parent "who is described in § 36-1-117(b) or (c)" comes under the "termination" provisions of that section. To further aid the reader, we will again quote the pertinent language of § 36-1-117(b) and (c):

> (b)(1) *If a petition has been filed to establish paternity of the child who is the subject of the adoption proceeding*, the adoption court shall have exclusive jurisdiction to hear and decide any paternity petition filed in the adoption proceeding or that has been transferred to it pursuant to § 36-2-307.
>
> *       *       *
>
> (c) The *parental rights of the putative biological father of a child* who has not filed a petition to establish paternity of the child or *who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria* shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:
>
> > *(1) The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318 a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;*

(Emphasis added.)

Father falls under both Tenn. Code Ann. § 36-1-117(b) and (c). As to subsection (b), he filed a petition to establish paternity of a child who was already the subject of an

---

App. E.S., filed Dec. 20, 2012); *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *12 (Tenn. Ct. App. E.S., filed Apr. 1, 2013).

adoption proceeding. The prospective adoptive parents filed their petition to adopt in the trial court on July 30, 2012. The same petition also sought to terminate Father's parental rights. On August 2, 2012, father filed an "Emergency Petition to Establish Paternity and Other Relief" with the Davidson County Juvenile Court. After a hearing, the Davidson County Juvenile Court transferred the case to the trial court in an order entered October 8, 2012. In short, father filed a petition to establish paternity, but he did so after the child was the subject of an adoption proceeding.

As to subsection (c), father had not established paternity of the child when the child became the subject of an adoption proceeding. As stated above, he filed a petition to establish paternity after the adoption petition had been filed. In his petition father stated he "believes" the child to be his and that mother had "indicated" he was the father of the child, but he requested a DNA test to verify his paternity. Finally, father meets the description in subsection (c)(1) because he filed an intent to claim paternity with the Putative Father Registry on June 27, 2012, a few weeks before the child's birth.

In summary, the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g)(9)(A) apply to "any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . is not the legal parent . . . of such child or who is described in § 36-1-117(b) or (c)." When the petition to terminate his rights was filed, father was not the child's legal parent and he was "described in § 36-1-117(b) or (c)." For these reasons, the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g)(9)(A) are applicable to this case.

C.

We now address whether the petitioners established by clear and convincing evidence that father failed to pay "without good cause or excuse . . . a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth." Tenn. Code Ann. § 36-1-113(g)(9)(A)(i). Father testified that he contributed nothing to mother's household or other expenses after he learned of the pregnancy. The trial court concluded father, instead, "lived off of [mother's] support."

Father explains that in the months before his incarceration he was unemployed but looking for work. On appeal, he argues that his "failure to pay was in accordance with his financial means" and that he acted "with good cause and excuse." The trial court rejected father's argument, instead finding him to have been "in good health" and "a relatively young man at age 33" with "no good cause or excuse for failing to pay a reasonable share of prenatal expenses incurred by [mother] and on behalf of [the child]." The trial court noted that father quickly found employment after his release from prison in 2014, counter to father's assertion that he had struggled to find work because of his criminal past. The trial court concluded he would have been just as able to find

13

employment before his incarceration. We also note that even when father worked in prison and earned $25 a month, he failed to send any of it to support the child.

Father also argues that he did not provide for mother's pregnancy or birth expenses because "there were no such expenses." He described mother's expenses as "imaginary," and cites her testimony that she was on Medicaid and did not personally pay any doctor's bills. He also stated at trial that certain expenses for the child were not necessary because Mother had planned to re-use items, such as a crib and bedding, she purchased previously to care for her older daughter. Father relies on *In re Anna S.*, No. E2009-02664-COA-R3-PT, 2010 WL 1838070, at *8 (Tenn. Ct. App. E.S., filed May 6, 2010) to support his argument that it is improper to terminate parental rights on this ground if the father was unaware any such expenses existed. Distinct from the facts of the current case, *In re Anna S.* involved a mother who refused the father's attempts to communicate with her during her pregnancy and who told the father's sister that she had miscarried. *Id.* In the current case, father knew of mother's pregnancy by November 2011 and knew by February 2012 that mother planned to give the child up for adoption.

The trial court found certain expenses are "normal and customary in connection with the pregnancy of any mother." Additionally, the court found that mother's income was "very limited" and although mother "did her best" to support herself, father, and Natalie, she was "ultimately evicted from her apartment because of her inability to provide adequate support." The evidence does not preponderate against the trial court's findings of fact. We affirm the trial court's ruling that there was clear and convincing evidence to establish that termination is proper under this ground.

### D.

Next, we consider whether the petitioners proved that father failed to manifest an ability and willingness to assume legal and physical custody of the child such that it would be proper to terminate his parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). Father has expressed a willingness to assume legal and physical custody of the child. On October 20, 2014, shortly after his release from prison, father moved for temporary visitation with the child, though his request was denied. Soon after his release, he obtained employment earning $9 an hour and had the same job at the December 2014 trial. He also earned his General Education Diploma in prison. We note, too, that father's mother and stepfather, R.F. and J.F., intervened in the adoption proceeding, requesting custody of the child while father was incarcerated. R.F. also contacted mother three times during the pregnancy and once expressed to mother her desire to adopt the child. Both R.F. and J.F. testified on father's behalf at trial.

Even assuming father's willingness to take custody of the child, his circumstances raise several questions. First, he lives with his parents and does not pay rent. He has never had his own independent housing, instead staying with his mother, friends,

14

girlfriends, and his mother's ex-husband. For most of his adult life, father largely has been reliant on others for basic living expenses. Even at trial, he admitted that he would need some help and support from others to care for the child if he were to be given custody. Father testified that if something were to happen to R.F. and J.F., then "my sister and my brother, aunts, uncles, there's a number of people who would help me." But besides R.F. and J.F., no other members of father's family testified on his behalf.

Father also has no means of transportation. He lacks a vehicle and a driver's license. His driver's license was suspended for an unpaid citation. The trial court found that "to reacquire his license" he would, "at minimum" have to pay restitution and back child support. Because of his repeated criminal offenses and probation violations, he will remain on probation until 2022. Although he had a job at the time of trial, his work history since he dropped out of high school has been sporadic, such that he frequently has been fired or left jobs without another lined up. On several occasions, he has gone for months without work while living off the support of family and friends.

Previously, the Supreme Court considered a similar question in *In re Bernard T.*, 319 S.W.3d 586, 604-05 (Tenn. 2010). There, Junior D. – who was not the legal parent, biological parent, or putative father of all the children at issue in the case – was found to have "manifested a commendable willingness to assume legal custody of all the children. . . ." *Id.* But the court concluded that despite this willingness,

> [h]owever, during the hearing in juvenile court, Junior D. conceded that he was unable to support the children financially and that he could not provide them with a stable residence. This testimony alone provides clear and convincing evidence that Junior D. does not presently have the ability to assume legal and physical custody of any of the children.

*Id.* The situation here is somewhat similar. Father continues to be reliant on his mother and stepfather for both housing and transportation. No home study has been done on R.F. and J.F.'s home. Regarding his income, father asserts that he works full-time, but his stepfather, who often drives him to work and helped father get the job, could not verify this at trial. Regarding his expenses, father has significant demands on his income due to child support for Bryce, probation fees, and restitution fees related to the Raceway theft.

We also addressed this ground in *In re Adoption of S.T.D.*, and there, weighed a father's behavior toward his other children when considering whether he manifested an ability to care for the children at issue in that case. We stated,

> [r]espondent apparently has three other children, two of whom live in Illinois. Respondent testified that he has never

15

> paid child support to the mother of his children in Illinois. Respondent's other child . . . was staying with the stepmother at time of trial. She testified that Respondent has never checked on that child and has never offered her any child support. *All of this evidence demonstrates that Respondent has not manifested any kind of ability to assume legal and physical custody of the children.*

2007 WL 3171034, at *8 (emphasis added). In September 2011, father was ordered to pay $300 per month to support Bryce and pay down an arrearage of $9,631.82. He did not make a single payment to comply with the order prior to his incarceration. At trial, father testified that he did not support Bryce even when he had the money to do so:

> Q. Can you explain to the Court why you were declining to pay your child support when you had that money coming in?
>
> A. I can't say. I made some mistakes in my past life and I'm not really proud of that, but I'm realizing exactly, you know, what needs to be done now and I'm taking care of it.
>
> Q. So you had the money to pay your child support?
>
> A. Some – some of the time, yes.
>
> Q. But chose not to?
>
> A. Yes.

At the time of trial in December 2014, father reported that he paid more than $50 each month to pay down his arrearage, which by that time exceeded $14,000. While incarcerated, father never sent any of his income to support Bryce or F.N.M. Previously, we have found an incarcerated "[f]ather's failure to provide *any* support to [his children] despite having earned at least some small amount of money, and, with no credible explanation as to why he failed even to attempt to fulfill this basic parental duty, demonstrates willful failure to support." ***In re Maria B.S.***, 2013 WL 1304616, at *10.

The trial court determined that father also failed to visit Bryce at all in the four months prior to his 2012 incarceration.

> Q. So why didn't you spend time with Bryce?

16

A. I really don't know. I wasn't perfect back then and I realize I wasn't perfect back then, but it's all changed. It's – I love both of my children dearly.

Q. And I just want to clarify . . . when I questioned you earlier you testified that you went and saw Bryce about every other weekend –

A. Yes.

Q. – and then – . . . when the Judge asked you later on, your testimony was that you didn't go see him during that four-month period.

A. During the four-month period, no, I didn't go see him.

As in *In re Adoption of S.T.D.*, we find the evidence does not preponderate against the trial court's finding that father has not manifested an *ability* to assume legal and physical custody of the child. 2007 WL 3171034, at *8. The trial court found that father "states that he has a willingness and a desire to [assume legal and physical custody of the child], but without the ability to fulfill his willingness and desire, such is a hollow representation." The evidence supports the trial court's ruling. For the reasons stated above, we affirm the trial court's decision to terminate father's parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv).

E.

We now consider whether placing the child in the father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child, such that termination of father's parental rights is appropriate under Tenn. Code Ann. § 36-1-113(g)(9)(A)(v). Here, the trial court found "no reason to believe that [father] would harm [the child]. The issue is whether placing [the child] in the custody of [father] would pose substantial harm to her physical or psychological welfare."

The Supreme Court "reject[s] the contention . . . that at some point the fact that the child has been in the custody of a non-parent for a period of time means that a lesser standard can be applied in determining whether parental rights may be terminated." *In re Swanson*, 2 S.W.3d 180, 188 n.13 (Tenn. 1999). The court explained that "[s]uch a standard would increase the likelihood for delaying cases in order that the child remain in foster care." *Id.* Similarly, in *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), the High Court declined to terminate parental rights where "the only evidence of substantial harm arises from the delay caused by the protracted litigation and the failure of the court system to protect the parent-child relationship throughout the proceedings."

17

215 S.W.3d at 812. In that case, the court stated that "[e]vidence that [the child] will be harmed from a change in custody because she has lived and bonded with the [non-parents] cannot constitute the substantial harm required to prevent the parents from *regaining* custody." ***Id.*** (internal citation omitted; emphasis added).

Here, the trial court distinguished the case from ***A.M.H.***, stating in its final order:

> In ***AMH***, the parents had a bonded relationship with their child. The petitioners obstructed the continuation of that relationship. In the case before the Court, [father] has never had a relationship with [the child]. Further, [father] was incarcerated from the time of F.M.'s birth on July 14, 2012, until October 3, 2014. He could not have assumed legal or physical custody of [the child] prior to October 3, 2014. In addition, the case was set for trial on two prior occasions. On one occasion, the trial was continued because of the illness of [father's] counsel. On another occasion, the trial was continued at the request of [father], because his counsel wanted the opportunity to take the deposition of [mother]. The trial of the case then went forward as scheduled on the third occasion, December 10, 2014.

In ***State v. C.H.H.***, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *8-*9 (Tenn. Ct. App. E.S., filed May 21, 2002), we found that removing a child from a home in which the child had bonded with the foster family would constitute "substantial harm." In that case, we restated the trial court's finding

> [t]hat awarding legal and physical custody of the [child] to [father] would pose a risk of substantial harm to the physical or psychological welfare of the [child]; more specifically, the Court does not know why [father] delayed taking action to claim this [child], but the Court does know the results of this delay. This [child] is now in a safe, secure and loving home with [the child's] family. [The] foster parents are prepared to adopt [the child and the twins]. [The child and the twins] have lived in this home since April 21, 1998, and this is the only family [the child] now knows. [The child] is bonded to [the] foster parents and sees them as [the child's] emotional/psychological parents. [The child] is

18

also securely attached to [the child's younger siblings]. To remove [the child] from [the foster parents and siblings] would be cruel and would cause grave trauma to this [child].

The record on appeal supports the [t]rial [c]ourt's determination that an award of custody to [f]ather would result in emotional harm to the [c]hild. The evidence does not preponderate against the [t]rial [c]ourt's finding that after living with the same set of foster parents for two and a half years, the [c]hild has formed a bond with the foster parents and sees them as parents. Moreover, the evidence does not preponderate against the [t]rial [c]ourt's finding that the [c]hild is attached to her siblings with whom the [c]hild has lived for most of her life. . . . The record on appeal shows that, due to the negative emotional consequences that removal would have on the [c]hild and due to [f]ather's callous disregard for the relationship the [c]hild has with the foster parents and siblings, an award of physical and legal custody to [f]ather poses a risk of substantial psychological harm to the [c]hild. Accordingly, we find no error in the [t]rial [c]ourt's determination that this ground for termination of [f]ather's parental rights was established by clear and convincing evidence.

*Id.*, at \*9.

Here, mother testified that the petitioners met her at the hospital the day that she contacted them about the adoption. The child was delivered by Cesarean section. Mother testified that S.L.D., the prospective adoptive mother, held her hand throughout the surgery and was with her when the child was delivered. The delivering physician handed the child to S.L.D. after the delivery. Mother said she never held the child. The child has remained with the petitioners since her birth.

At trial, the petitioners presented Dr. William Kenner as an expert witness on child psychiatry. The trial court found "his testimony to be completely credible." Dr. Kenner had conducted a home visit of the petitioners' home, which lasted more than two hours. He testified to his observations during the visit. Dr. Kenner described the petitioners as "doting parents" and said that the child "loves them deeply and is quite securely bonded to them." He also added that the child is "quite healthy, she's gregarious and outgoing, loves people, and all of that speaks to the quality of her relationship – her relationships with her adoptive mother and father."

19

Dr. Kenner also outlined the adverse psychological and physical effects a child experiences if taken away from the person or persons with whom the child has bonded. He testified that "[i]t would be devastating for her . . . . [W]e now know that to remove a child from – and to break those attachment bonds, produces trauma and the children actually develop PTSD; post-traumatic stress disorder." Dr. Kenner further testified that "while she might not remember that she was taken away from the adoptive parents she loved, the damage would be there." He also added that "there are quite a number of physical experiences or physical problems that come up as a result of trauma." At trial, father testified that he has no reason to believe the child had not bonded with the petitioners. Still, father wishes for the child to be with her biological family.

The trial court held that

> [t]he only parents [the child] has ever known are the petitioners. . . . Since her birth . . . [the child] has thrived. The attachment bond between [the child] and [prospective adoptive father] and [the child] and [prospective adoptive mother] is extremely strong. Evidence of this bond has been established through both lay and expert testimony. . . . The [c]ourt concludes that to remove [the child] from the physical custody of the petitioners would like[ly] cause her extraordinary physical and/or psychological harm.

Petitioners have a significant bond with the child. She has known no other family besides them. Father does not have a relationship with the child, due in large part to his incarceration for almost all of the child's life. The evidence does not preponderate against the trial court's finding, and we affirm that the petitioners proved by clear and convincing evidence that removing the child from the petitioners' custody and placing her with father would cause her substantial physical and psychological harm.

## VI.

Having found grounds to terminate father's parental rights, we must next determine whether the termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2). The question of best interest "must be determined from the child's perspective and not the parent's." *In re Jamazin H.M.*, 2014 WL 2442548, at *11. Tenn. Code Ann. § 36-1-113(i) provides a non-exhaustive list of factors to consider to determine a child's best interest. *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2014). These are:

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;

20

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9).

Father has provided little proof that he has substantially changed his circumstances. Although he earned a GED and had obtained a steady job prior to trial, many issues persist. He continues to rely on others for housing and transportation. No testimony was put forward to establish that his mother's home, his residence at the time

of trial, would be a safe or suitable home for the child and no home study had been completed. The trial court also doubted that he would continue to reside there for any substantial period of time. The trial court found he "is still living the nomadic existence that he has experienced over the last fourteen or fifteen years" and that "[i]f [father] should move from the home of his mother and stepfather, the [c]ourt has no confidence that [he] will be able to establish a safe and healthy home for [the child]." Based on father's own testimony, he would need some support of other family to care for the child.

Dr. Kenner testified that a change in caretakers and physical environment would adversely affect the child. The trial court found, and the evidence supports, that the child has a strong relationship with the petitioners, such that "breaking the attachment bond" between them "would have a severe negative impact on [the child's] emotional, psychological, and medical condition." We note that father moved for a temporary visitation order on October 20, 2014, approximately eight weeks before trial, but was denied. The trial court found no proof that father had ever seen the child and found that the two of them have no relationship whatsoever. The testimony at trial established that the petitioners and child have a strong bond and supports the finding that the petitioners are devoted to the child. AGAPE of Nashville conducted a voluntary preliminary home study of the petitioners' home. The study revealed the petitioners "met the requirements by the State of Tennessee for adoptive parents." At trial, petitioners had two friends testify as character witnesses, both of whom described the petitioners as providing a safe and loving home for the child.

There is no indication in the record that father has ever provided any support to the child. Father did not send any of the money he earned in prison to support the child. Additionally, the trial court stated "since [father's] release, he has . . . made no tender to the court of any support that he would suggest should be provided to [the child]."

For all of the above reasons, we find that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that it is in the best interest of the child to terminate father's parental rights.

VII.

The judgment of the trial court is affirmed as modified. The costs on appeal are assessed to the appellant, W.C.G. This case is remanded to the trial court for enforcement of the trial court's judgment, as modified, and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE

22